## THE CUZCO.

### (District Court, S. D. New York. March 8, 1907.)

COLLISION—JAMMING OF VESSEL AT PIER—BOTH VESSELS IN FAULT.

A steam lighter, jammed while discharging cargo at a wharf in the Erie Basin by a car float lying alongside a steamship fastened at an adjoining wharf, through the listing of the steamship when the tide ebbed, *held* in fault for going to and remaining in a dangerous position after being warned by the harbor master; and the steamship also *held* in fault for causing the float to be brought to her side, when she knew that she would list when the tide receded and push the float against the lighter.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 102.]

In Admiralty.

James J. Macklin, for libellant.
Convers & Kirlin and John M. Woolsey, for the Cuzco.
De Forest Bros. and George Holmes, for the Railroad Company.

ADAMS, District Judge. This action was brought by the Delaware, Lackawanna & Western Railroad Company, the owner of the steam lighter Syracuse, to recover from the steamship Cuzco, the damages suffered on the 10th day of March, 1906, by reason of the lighter being squeezed between a car float and an adjoining pier, in the Elevator slip in Erie Basin, through the Cuzco's taking ground and listing over against the float and pressing her against the lighter. The Cuzco went to the opposite side of the slip on the day before the accident for the purpose of discharging and made fast on her port side. The Syracuse's pier was 120 feet to the eastward of the Elevator Pier. She was also bow in. The charge of fault against the Cuzco was that the stevedore employed in discharging her directed the car float to come alongside and in doing so improperly exposed the Syracuse to the danger of damage. The Cuzco brought the owner of the car float into the action by petition alleging that if there was any fault for which the Syracuse was not herself liable, caused by her act of stealing a berth in a space cleared of boats for the use of the car float, it was that of the Railroad Company in having its tug place the float in a position to do

the damage, well knowing that the Cuzco would necessarily list over with the fall of the tide.

The testimony shows that the Cuzco was 375 feet long and 50 feet beam. She had four hatches. Her mean draft was 20.9 feet. A part of her cargo was nitrate in bags which she expected to discharge from all of her hatches into cars on the float for transportation to its destination. It was expected, however, to commence with the No. 2 hatch and for that purpose it was necessary to get the forward car opposite that hatch, which was well toward the bow. The float was brought to the vicinity by the tug Red Ash on the morning of the 10th but the slip was then in such a congested condition that it became necessary to clear it to permit the float's approach to the steamer and the tug went to work removing the various barges and lighters which blocked it up. She succeeded in this work in a short time and went for the float, which was outside awaiting the completion of the clearing. In the meantime the lighter Syracuse, 110 feet long and 32 feet wide, which had a small quantity of cargo for the bark Thistle Bank, lying on the other side of the slip, nearer the bulkhead, and which had been awaiting an opportunity to deliver, went into the cleared space and made fast at about 9 o'clock to the wharf opposite the Cuzco, astern of the bark and a barge lying astern of her with some cargo for her. After the Syracuse had been made fast the float was also pushed into the cleared space and while she reached the side of the Cuzco, by reason of the presence of the lighter could not get into position to use No. 2 hatch. The tide was about high at 7:30 A. M. It was ebbing when the lighter took her position. There was not sufficient water for the Cuzco to lie afloat at low tide and it was well known to the officers and others in the vicinity that she would take ground during the morning and probably list over towards the opposite wharf. The water was 18 feet deep inside of the ship and 21 or 22 outside.

There was evident danger, to those familiar with the facts, to vessels between the Cuzco and the wharf on the other side of the slip, and it is claimed by the steamer that warning was given to the Syracuse before she made fast that she would incur risk if she attempted to occupy the berth she was about taking and that notwithstanding the warning she took the berth and persisted in remaining in it. Those on the Syracuse admitted that such warning was given but claimed it was after she was caught, when it was impossible to move, and too late to be of any use.

The master of the Syracuse was very emphatic in his assertion that he had no warning of the danger before his boat was caught and he was supported by the other members of his crew. The chief officer of the ship said he knew his vessel would take the ground with the recession of the tide and informed the receiving clerk of the cargo of the fact when he saw the Syracuse taking her position at the wharf. The Cuzco had listed before some 5 or 6 degrees in the same berth and it was expected she would on this occasion and actually did. The chief officer said it was not a bad list but enough to jam vessels lying there; that a tug had been squeezed on a previous occasion. The Cuzco had about 6,000 tons of cargo on and weighed some 2,000 tons in addition, a total weight of about 8,000 tons, which would make the listing dangerous to other vessels. The property belonged to the Beard estate,

which was represented at the place by a Mr. Lowery, who said he was on the Cuzco and saw the Syracuse coming in ahead of the float; that he beckoned to the master and told him to stay out as he wanted the place for the float alongside of the Cuzco; that in reply the master said he would not be in the way, was going far enough to clear the float and Mr. Lowery understood that he was going along side of the bark; that nothing further was said at the time but instead of going alongside of the bark, the Syracuse went to the wharf which brought her abreast of the Cuzco's No. 1 and No. 2 hatches; that then the float was pushed in and came to the corner of No. 2 hatch, lapping the stern of the Syracuse about 15 feet; that when he saw the Syracuse tie up in the position she did, he went aboard and told the master that he had better leave there; that at low water he would be jammed and unable to get out; that the master asked what could he do? said he had to discharge his freight, he had a little more work to do, he would see if he could not get more men; that the Syracuse was free then and could have gone alongside of the bark, or to a berth forward of the Cuzco; that the Cuzco began to list about 11 o'clock; that he was employed in the Erie Basin to regulate traffic there as harbor master and was continually ordering boats from one place to another and having them give way; that he had no way of enforcing his orders. This testimony is confirmed by other witnesses and I think it outweighs the testimony on behalf of the lighter.

It appears before the jamming took place that the Syracuse moved forward a few feet, close up under the stern of the barge ahead, and that the float was also moved some distance in an endeavor to reach No. 2 hatch but still without success. Then resort was attempted to be had to No. 3 hatch by getting the opening in the side of a car opposite or near that hatch but it was not successful by reason of the jamming and the consequence was that no nitrate was discharged that day, though the ship put some goods of a different nature on the wharf.

The value of the time of the Syracuse was more than double that of the car float. The value of the time of the Cuzco was three times as great as that of the Syracuse and the float combined.

It is claimed that by reason of the conduct of the master of the Syracuse in taking and persisting in remaining in a dangerous berth, after due warning, that the libellant is not entitled to recover any damages, but I think that is an extreme view. She certainly incurred the risk. Her conduct was undoubtedly reprehensible. While she paid wharfage for the place in which she was injured, she was not thereby exonerated from the result of her own obstinacy in going to and remaining in a dangerous place to the exclusion of the use of the basin by more valuable vessels. There were no absolute regulations about the matter. It was one of those cases where mutual care and accommodation are required, and, to the credit of those concerned, is usually accorded, notwithstanding the absence of power on the part of Mr. Lowery to enforce his orders.

I think the Syracuse was in fault for not obeying the orders of Mr. Lowery to go to some other berth, of which there were several in the vicinity, unoccupied or which could be made so by the power of the Syracuse. The question remains was she solely in fault. The float

was under the control of the Cuzco for the purposes of discharging and may be regarded as her instrument. The officers of the Cuzco knew well the danger that would be created to the Syracuse by bringing the float to her own side and forcing it in such close proximity to the stern of the Syracuse. The stevedore, the agent of the steamer for the purpose of discharging, knew it also and yet insisted upon leaving it in the dangerous position. Because the Syracuse was doing a wrong thing, it did not justify the ship in injuring her.

There will be a decree for the libellant for half damages against the Cuzco, with an order of reference. The petition against the Railroad Company will be dismissed.